U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
OCT 10 2018
AT____ O'CLOCK
John M. Domurad, Clerk - Albany

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | Criminal No. 1:18-CR-338 (NAM) |
| ) | |
| v. ) | **Indictment** |
| ) | |
| ) | Violation: 18 U.S.C. § 1832(a)(5) |
| **JEAN PATRICE DELIA and MIGUEL** ) | [Conspiracy to Steal Trade |
| **SERNAS,** ) | Secrets] |
| ) | |
| ) | One Count and Forfeiture Allegation |
| ) | |
| **Defendants.** ) | County of Offense:  Schenectady |

## THE GRAND JURY CHARGES:

At all times relevant to this Indictment:

1. The General Electric Company ("GE") was a publicly-traded corporation whose business focused on providing products and services in the energy, technology, finance, industrial, and consumer product industries. GE maintained a facility in Schenectady, New York, within the Northern District of New York. GE marketed, sold, and distributed its products and services in interstate and foreign commerce.

2. As part of its normal business operations, GE designed, manufactured, and sold turbines and related components for use in electric power plants around the world. A GE business unit in Schenectady, New York—the GE Energy Performance Testing Group ("PTG")—created, developed, and used certain computer programs, mathematical tools, computer models, and databases ("the Tools") to help calibrate those GE components, and thereby improve the efficiency and profitability of the power plants in which they were installed. The PTG spent decades collecting and analyzing operational data from GE components installed at power plants around the world, and expended millions of dollars and thousands of employee hours developing that data into the Tools, which allowed PTG engineers to accurately predict and model the behavior of GE

components given varying conditions, and thereby calibrate them for optimal efficiency. Operators of power plants in the United States and throughout the world entered into paid contracts with GE to have PTG engineers visit their power plants and use the Tools to calibrate their GE components and power plants. The Tools conferred a unique competitive advantage to GE. To facilitate providing calibration services to customers, GE embedded certain components of the Tools—including proprietary data, computations, formulas, and analysis—into documents and reports as a routine practice. GE treated these documents and reports with the same degree of sensitivity as the Tools.

3. In light of the sensitivity and value of the Tools, GE considered them to be trade secrets and confidential and proprietary information. GE took reasonable measures to protect and keep the Tools secret, including physical security of the exterior and interior of GE premises; implementing data security policies and computer firewalls to prevent unauthorized access to GE information, including the Tools; only allowing employees with work-related reasons access to the Tools; monitoring transfers of information by employees; requiring employees to acknowledge that GE's information may not be copied or removed before accessing GE computers; and training employees on information security measures.

4. The Tools derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. GE did not license or otherwise make the Tools available to the public or its customers.

5. In addition to the security measures above, GE required employees, including those with access to the Tools, to sign confidentiality agreements as a condition of employment. These confidentiality agreements included an obligation to safeguard GE's confidential and proprietary information and prohibited employees from using, disclosing, or retaining any secret or

confidential information. Persons leaving GE's employ were also required to sign an acknowledgement that they had surrendered all GE documents, computer programs, and other GE information and documents.

6. From November 2001 to September 2009, the defendant, **JEAN PATRICE DELIA**, a citizen of Canada, was employed by GE as an engineer with the PTG. Among other things, DELIA was, at various times, responsible for traveling to GE customer locations around the world and using the Tools to calibrate the customers' power plants. DELIA's job responsibilities required that he be, and was in fact, given access to the Tools and other highly-sensitive GE information.

7. On or about June 19, 2008, while still employed as a performance engineer at GE, DELIA co-founded a company in Montreal, Canada called Thermogen Power Systems ("TGPS") with co-conspirator and defendant **MIGUEL SERNAS**, a former GE employee and citizen of Mexico. Through TGPS, DELIA and SERNAS sought to, and did, compete with GE's PTG by offering comparable calibration services and soliciting GE's customers around the world.

8. From about October 2009 to about July 2011, DELIA took a sabbatical from GE. While on sabbatical, DELIA, assisted by SERNAS and others, developed a detailed business plan for TGPS.

9. After his sabbatical, DELIA returned to GE on or about July 4, 2011 as a project manager with the Energy Learning Center ("ELC") based in Montreal, Canada and Schenectady, New York.

10. DELIA resigned from GE effective July 27, 2012. In connection with an exit interview with GE personnel on July 25, 2012, DELIA signed an "Employee Innovation and Proprietary Information Agreement," wherein he acknowledged that he did not have permission

3

to retain any GE information, and certified falsely to GE that he had returned all GE information and was not resigning from GE to work for a competitor.

## COUNT ONE
### (Conspiracy to Steal Trade Secrets)

11. Paragraphs One through Ten are re-alleged and incorporated by reference as if fully set forth herein.

12. From in or about June 2008, and continuing through at least October 15, 2013, in the Northern District of New York, and elsewhere, the defendants, **JEAN PATRICE DELIA** and **MIGUEL SERNAS**, did knowingly conspire with each other, and others, with intent to convert a trade secret that was related to a product or service used in or intended for use in interstate and foreign commerce, to the economic benefit of anyone other than GE, the owner of the trade secret, and, intending and knowing that the offense would injure GE, to:

(a) steal and without authorization appropriate, take, carry away, and conceal, and by fraud, artifice, and deception obtain such information, in violation of Title 18, United States Code, Section 1832(a)(1);

(b) without authorization copy, duplicate, download, upload, photocopy, replicate, transmit, deliver, send, communicate and convey such information, in violation of Title 18, United States Code, Section 1832(a)(2); and

(c) receive, buy, or possess such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, in violation of Title 18, United States Code, Section 1832(a)(3).

### **Purpose**

13. It was a purpose of the conspiracy for DELIA and SERNAS to convert, steal, copy, and possess GE's trade secrets and confidential and proprietary information, including the Tools,

4

and use that information to offer competing turbine-calibration and other services to GE customers and other power plant operators around the world, for their own economic interests and the business interests of TGPS, and to the detriment of GE.

### Manner and Means

14. In furtherance of the conspiracy, DELIA and SERNAS employed the following manner and means, among others:

15. It was part of the conspiracy that DELIA used his position within GE to obtain access to GE's trade secrets and proprietary and confidential information, including the Tools.

16. It was part of the conspiracy that DELIA, after obtaining GE's confidential information, transmitted it outside of GE for reasons unrelated to GE-business using various means, including emailing it to personal and TGPS email accounts, uploading it to TGPS servers, and saving it to external media used for personal and TGPS business.

17. It was part of the conspiracy that DELIA, shortly before resigning from GE in July 2012, copied thousands of GE documents, including the Tools, to personally-owned computer storage devices he used for personal and TGPS business, and subsequently uploaded those materials to TGPS servers as well as TGPS and personal email accounts.

18. It was part of the conspiracy that DELIA and SERNAS used the proprietary information that DELIA stole from GE, including the Tools, to prepare and submit competing bids for turbine calibration services to GE customers around the world, for the benefit of their own economic interests and those of TGPS, and to the detriment of GE.

19. It was part of the conspiracy that DELIA and SERNAS used the proprietary information that DELIA stole from GE, including the Tools, to prepare analyses for GE customers

5

and calibrate power plants of GE customers, for the benefit of their own economic interests and those of TGPS, and to the detriment of GE.

20.     It was part of the conspiracy that, upon his departure from GE in July 2012, DELIA represented falsely to GE that he had returned all GE confidential information to GE, and represented falsely that he was not leaving GE to work for a competitor.

21.     It was part of the conspiracy that DELIA and SERNAS, through TGPS, bid on contracts to provide calibration services to a GE customers around the world, including a customer based in Saudi Arabia for a fraction of the price that GE intended to charge the customer, for the benefit of their own economic interests and those of TGPS, and to the detriment of GE.

22.     It was part of the conspiracy that DELIA and SERNAS took steps to avoid detection of their illegal activities by GE.

### Overt Acts in Furtherance of the Conspiracy

23.     In furtherance of the conspiracy and to accomplish its purposes, DELIA and SERNAS committed and caused others to commit the following overt acts, among others:

24.     On or about June 19, 2008, DELIA established TGPS in Canada.

25.     On or about July 20, 2009, DELIA and SERNAS communicated by Google Chat about marketing TGPS' services to the operator of a power plant in Mexico. DELIA and SERNAS discussed that it "could be the first job of TGPS" and that "it's impossible that we can't make a living with that kind of incompetence going around I think if we can get a couple of jobs . . . and get in good with the right people, and reference the codes, we should be ok to live well for a few years with a couple of jobs in the middle east." DELIA also told SERNAS, in relation to a power plant operator in Saudi Arabia, that "we need to get in to that, I already have a guy inside we can definitely come in cheaper."

26. On or about August 4, 2009, DELIA sent an email to the operator of the power plant in Mexico referenced in Paragraph 25 attaching a TGPS service proposal for calibration services.

27. On or about August 9, 2009, DELIA sent an email to SERNAS attaching the file "Cerro Prieto Uncertainty Analysis.xls" in connection with a TGPS proposal for the power plant in Mexico referenced in Paragraph 25.

28. On or about January 12, 2010, DELIA sent an email to a TGPS associate stating, "Don't mention our company TGPS yet. I will bring it up with him tomorrow morning. At least, this will give me the opportunity to engage GE in official discussions without causing too much trouble and it will show him that you have a preference on who is there for your test."

29. On or about February 12, 2011, DELIA sent an email to SERNAS attaching a confidential GE document, created and owned by GE, "06P0431+Opt+1_Tracetebel_Marafig+4x307FACC_PLANT+TEST+Price+S.xls," and stating, "I based the prices on what we know from our competitors, we're going to come in at least 50% cheaper than our most familiar competition. For reliability, I had no real model so I based the number on the number of days X 700 USD. Check out the quote document from our friends to give you an idea how much they charge for a PTC-4.6 test."

30. On or about May 10, 2011, DELIA sent an email to SERNAS concerning a TGPS bid, attaching a confidential GE pricing document, created and owned by GE, "Internal+Quote+File+Conduct.xls," and stating, "I'm comfortable with the estimate of $25-30k. our competition would be around 44K for this type of test . . . ."

31. On or about July 4, 2011, DELIA returned to GE as a project manager with GE's Energy Learning Center.

32. On or about February 22, 2012, DELIA sent emails to SERNAS attaching confidential GE documents, created and owned by GE, "Gas Atacama Curves.xlsx" and stating, "This one will work" and "Here you go. I think that's the graphs we needed. You just need to finish the format to make it ours."

33. On or about May 3, 2012, DELIA caused an email to be sent on behalf of TGPS to a longstanding GE customer attaching a bid entitled "TP248_P01_Arabian Bemco_Qurayyah_GT Performance Acoustics_Rev01.pdf."

34. On or about May 14, 2012, DELIA copied more than 8,500 confidential GE files, including the Tools, to personally-owned computer storage devices.

35. On or about July 13, 2012, SERNAS sent an email to DELIA and others stating, "Team, we are very close to potentially win the [Saudi Arabian] opportunity. This is the opportunity that all of us have been waiting for. We need to get together and work very careful the proposals. Let's meet Monday 11am EST to discuss this. During the weekend I am going to be preparing the quote and will send you the files for your input."

36. On or about July 21, 2012, SERNAS sent an email to DELIA attaching a bid for a prospective TGPS customer based in Saudi Arabia.

37. On or about July 24, 2012, DELIA downloaded more than 500 confidential GE documents to a personally-owned storage device.

38. On or about July 25, 2012, during an interview with GE representatives in Schenectady, New York, DELIA said that he had transferred ownership of TGPS at the end of his sabbatical in July 2011 and also told the new owners of TGPS they should not bid against GE.

39. On or about July 25, 2012, during an interview with GE representatives in Schenectady, New York, DELIA said TGPS had not secured any business.

40. On or about July 25, 2012, during an interview with GE representatives in Schenectady, New York, DELIA signed an "Employee Innovation and Proprietary Information Agreement" certifying he had surrendered all GE documents in his custody and that he did not have permission to retain any GE documents.

41. On or about July 26, 2012, DELIA sent an email to a GE representative stating that in May 2011 he had asked Canadian authorities to "remove me for all functions of the company" and that "all functions should have been moved to my partner at the time."

42. On or about July 27, 2012, DELIA sent an email to a GE representative concerning the personally-owned storage devices that DELIA had connected to GE computers stating, "Permanently deleting any and all information on these drives will ensure that no GE confidential information is kept with me after my GE employment . . . ."

43. On or about July 27, 2012, SERNAS sent an email to DELIA attaching a bid for a prospective TGPS customer based in Saudi Arabia.

44. On or about January 3, 2013, DELIA uploaded numerous confidential GE documents, created and owned by GE, to www.thermogenpower.com, including the following: "DR Class File 1.xls," "DR Class File 2.xls," "DR Class File 3.xls," "GT Standard 4.01.xls," "Secondary Flow Influence Factors.xls," and "Secondary Flow DR Influence Factors.xls."

45. On or about February 15, 2013, DELIA uploaded numerous confidential GE documents, created and owned by GE, to www.thermogenpower.com, including the following: "Control Curve Constructor Template Rev 1.7 (Template).xls," "GT Standard 4.03_release_rev4 (Template).xls," "Landscape Chart Rev 2.8 (Template).xls," "Landscape Chart Template Rev 2.5 (ACME Rev 1).xls," "Landscape Chart Template Rev 2.5 (Template).xls," "PES GAS TURBINE CORRECTION CURVE GENERATION TOOL Rev 5.0 (Template).xls," "GT Standard Rev 4.2

(Sunny Hills-Tom).xls," "GT Control Curve Constructor Rev 1.9 (Sunny Hills).xls," "GT Standard Rev 4.2 (Sunny Hills).xls," and "PG7241 Lapse Rate Analysis 013003.ppt."

46. On or about March 23, 2013, DELIA sent an email, attaching the confidential GE document, created and owned by GE, "Discharge+Coefficient+Extrapolator+V+1.0(Draft).xls" to another TGPS employee, and providing information to that TGPS employee on how to use that document.

47. On or about May 23, 2013, SERNAS renewed the domain www.thermogenpower.com for a one-year period.

48. On or about October 15, 2013, DELIA sent an email attaching the document, "Qurayyah Correction Calculations.xlsx" to SERNAS and others and stating "For the PF correction, I agree that GE's number seem to be more conservative but I think we're stuck using their curve since it's part of the package, we're going to have trouble justifying it to SEC."

All in violation of Title 18, United States Code, Section 1832(a)(5).

**FORFEITURE ALLEGATION**

49. The allegations contained in this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1834.

50. Pursuant to Title 18, United States Code, Section 1834, upon conviction of an offense in violation of Title 18, United States Code, Section 1832, the defendants, **JEAN PATRICE DELIA** and **MIGUEL SERNAS** shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, a money judgment representing proceeds from the offense.

51. If any of the forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 1834.

Dated: October 10, 2018

A TRUE BILL,   name redacted

/Grand Jury Foreperson

GRANT C. JAQUITH
United States Attorney

By: /s/ Wayne A. Myers
Wayne A. Myers
Assistant United States Attorney
Bar Roll No. 517962

11